# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

*In re*: SPECALLOY      )
CORPORTATION      )
     )    **Case No. 1:17-MC-3807-WKW-DAB**
     **Debtor.**      )

## REPORT AND RECOMMENDATION

This matter comes before the Court on the motion of Heesung PMTech Corporation ("Heesung") to withdraw the reference in accordance with 28 U.S.C. § 157(d). (Doc. 1). The underlying bankruptcy case is *In re SpecAlloy*, No. 16-10013. On November 28, 2016, Judge Dwight H. Williams, Jr., generally continued the matters in the bankruptcy proceeding pending the outcome of litigation in this court. *Id*., Doc. 43-1. This matter is related to another case currently in this Court, 1:16cv703-DAB. Consideration of the present motion requires exposition of the parties' claims in both the bankruptcy court and the civil action.

William C. Carn, III, as the Chapter 7 Trustee ("the Trustee") of SpecAlloy Corporation doing business as Panhandle Converter Recycling ("SpecAlloy" or "the Debtor"), LKQ Corporation ("LKQ"), Converter Brokers, LLC, ("Converter Brokers"), and Enterprise Recycling, Ltd., doing business as Wrench-A-Part and Commodity Recyclers ("Enterprise") filed an Amended Complaint against Defendant Heesung PMTech Corporation ("Heesung" or "Defendant"). (1:16cv703-

1

DAB, Doc. 24).  The Trustee asserts claims of avoidable setoff pursuant to 11 U.S.C. §§ 553 and 550; avoidable preferences pursuant to 11 U.S.C. §§ 547 and 550; fraudulent transfers pursuant to 11 U.S.C. §§ 548 & 550; fraudulent transfers pursuant to the Uniform Fraudulent Transfer Act, Ala. Code §8-9-1, *et seq*., and 11 U.S.C. §§ 544 and 550; re-characterization of the advances; and equitable subordination.   LKQ, Converter Brokers, and Enterprise (collectively "the Suppliers") assert state law claims of conversion; breach of contract; quantum meruit; unjust enrichment; principal liability; and partner/joint venture liability. (16cv703, Doc. 24). For convenience herein, the Trustee and the Suppliers will, at times, be referred to collectively as "Plaintiffs."

On October 13, 2017, Heesung filed its Answer to the Amended Complaint and Counterclaim, stating a single claim for a declaratory judgment. (16cv703, Doc. 49 at ¶¶ 92-95). On December 11, 2017, Heesung filed this action seeking to withdraw the reference. The matter has been fully briefed by the parties and is ripe for adjudication.

## I.   JURISDICTION

As to this Miscellaneous proceeding, this court has jurisdiction pursuant to 28 U.S.C. §157. On January 11, 2018, this matter was referred to the undersigned by U.S. Chief District Judge William Keith Watkins for disposition or recommendation on all pretrial matters. (Doc. 3). *See also* 28 U.S.C. § 636(b); Rule 72, Fed. R. Civ.

P.; *United States v. Raddatz,* 447 U.S. 667 (1980); *Jeffrey S. v. State Board of Education of State of Georgia,* 896 F.2d 507 (11th Cir. 1990). In the related matters, the parties have consented to a United States Magistrate Judge conducting all proceedings and ordering the entry of final judgment pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1.

## II.    BACKGROUND AND POSITIONS OF THE PARTIES[1]

SpecAlloy, doing business as Panhandle Converter Recycling, is a company based in Dothan, Alabama. SpecAlloy sources or dismantles catalytic converters it has purchased from other companies, such as LKQ, Enterprise Recycling, and Converter Brokers.  SpecAlloy sells the components of the converters to buyers. Heesung was the primary buyer of materials, including precious metals sourced from the catalytic converters.

According to Plaintiffs, the relationship between SpecAlloy and Heesung changed in 2013.  Prior to 2013, SpecAlloy sold materials to Heesung on a "cash-immediately-prior-to-shipment" basis. (16cv703, Doc. 24 at ¶ 30). Beginning in 2013, SpecAlloy had insufficient working capital to continue its operations, source converters, and remain solvent. Thus, SpecAlloy required additional working capital in advance of purchasing the converters from companies such as LKQ, Enterprise

---

[1] This section outlines positions and allegations made by the parties and do not constitute any findings of fact. They are discussed here to show the nature of the disputes and the range of matters to be litigated.

Recycling, and Converter Brokers.  Heesung began transferring funds to SpecAlloy in advance of any shipments from the companies (the "advances"). The advances constituted SpecAlloy's primary source of working capital funding. SpecAlloy also had a smaller credit account with Wells Fargo. The advances from Heesung provided SpecAlloy with more funding than was required to purchase converters, which additional funding (the "excess advances") was used to fund SpecAlloy's working capital, general operation costs, and for other purposes.

The advances were undocumented or very sparsely documented with no formal loan documents memorializing a revolving line of credit.  Plaintiffs allege that Heesung gained control over SpecAlloy's financial and operational decisions in exchange for the funding provided through the advances. For the next two years, Heesung sent one or more of its employees or agents to represent its interests at SpecAlloy's facility on a regular basis. Heesung had access to SpecAlloy's customer invoices, purchasing plans, weekly projections, status reports, and other confidential business information.  In addition, Heesung required SpecAlloy to provide it with detailed projections that included documentation related to the value of the converters and materials that SpecAlloy proposed to acquire, as well as other supporting documents, such as purchasing plans, weekly projections, and status reports related to the shipments to be sent to Heesung.

Plaintiffs also allege that the relationship between Heesung and SpecAlloy was extremely close and that Heesung made decisions with regard to SpecAlloy's funding that determined whether or not SpecAlloy would be able to pay its creditors and remain in business. Heesung directed SpecAlloy to arrange for the acquisition of converters for its benefit. SpecAlloy took possession of converters from LKQ, Brokers, and Enterprise ("the Suppliers") and transferred them to Heesung. Thus, Heesung's position over SpecAlloy enabled Heesung to control the transfer of converters.

At some point in late 2015 or early 2016, SpecAlloy's financial performance was negatively impacted by falling commodity prices, poor decision-making, increased overhead, and other factors. In August 2015, consultants were hired to audit SpecAlloy's finances. The consultant's report indicated that SpecAlloy's financial position was worse than previously understood. The results of the audit were accessible to Heesung.

Between October and December 2015, Heesung began building a balance of cash and/or materials to set off against the amounts allegedly owing from SpecAlloy based on the excess advances. Heesung took certain materials from the facility and refused to pay invoices submitted by SpecAlloy. On or about December 11, 2015, Heesung seized certain materials, specifically pooled metals (the "seized pooled metals"), from SpecAlloy. Heesung did not pay for the seized pooled metals.

According to SpecAlloy's schedules and statement of affairs filed in the bankruptcy case, the value of the seized pooled metals is $2,718,656.26. (16cv703, Doc. 24 at ¶¶ 61-63). In bankruptcy proceedings, Heesung claimed a setoff based on the seized pooled metals. SpecAlloy also alleged in its bankruptcy statement that Heesung took the seized pooled metals within 90 days of the petition date without permission because SpecAlloy allegedly owed a debt to Heesung. *Id.* On or around December 15, 2015, Heesung's attorney sent a letter to Joe Donovan, SpecAlloy's Chief Executive Officer, purporting to effectuate a setoff of the excess advances against the amounts owed on the outstanding invoices (the "unpaid materials setoff").

As of December 15, 2015, SpecAlloy issued invoices to Heesung totaling $3,689,417.73. (the "outstanding invoices"). Heesung did not pay SpecAlloy for the materials on the outstanding invoices (the "unpaid materials"). Heesung took possession of the unpaid materials, including the catalytic converter components provided by the LKQ, Brokers, and Enterprise (the "supplier converters"), and shipped them to South Korea.

According to Plaintiffs, the value of the Supplier Converters was not less than $2,870,742.00.[2] SpecAlloy did not pay LKQ, Brokers, or Enterprise for the converters and advised Heesung on multiple occasions that title to the supplier

---

[2] Specifically, Plaintiff alleges the value of converters for LKQ is $1,637,000, for Enterprise is $875,742, and for Brokers is $358,000.  (16cv703, Doc. 24 at ¶ 77).

converters never passed to SpecAlloy. Less than a month after Heesung seized the pooled metals and converter components and sent the setoff letter, SpecAlloy was forced to file for Chapter 11 bankruptcy protection. As of the petition date, SpecAlloy reported total liabilities of $19,246,158.51 and total assets of $8,693,807.38. On March 17, 2016, the bankruptcy case was converted to one under Chapter 7 of the Bankruptcy Code. The bankruptcy court appointed William C. Carn III as the Chapter 7 trustee of SpecAlloy's bankruptcy estate.

On December 11, 2017, Heesung filed its motion, arguing that "[c]ause exists under 28 U.S.C. § 157(d) for the District Court to withdraw the reference [to the Bankruptcy Court] of the proceedings surrounding Heesung's proof of claim on a permissive basis." (Doc. 1 at 5).

## III. CLAIMS OF THE PARTIES

### A. The Plaintiff's Claims[3]

#### 1. Count I: Avoidable Setoff under 11 U.S.C. §§ 550 & 553

The Trustee of SpecAlloy asserts that both the seized pooled metals setoff and the unpaid materials setoff are invalid and should be disallowed. (16cv703, Doc. 24 at ¶¶ 90-118). Specifically, the Trustee contends that both setoffs by Heesung occurred within 90 days before the bankruptcy petition date while SpecAlloy was

---

[3] The Trustee filed a Demand for Jury Trial as to Counts VII, VIII, IX, X, XI, and XII. (16cv703, Doc. 54).

insolvent.  In other words, the Trustee argues that Heesung's setoff rights may be affected by the bankruptcy code pursuant to 11 U.S.C. § 553(a)(3).

The Trustee asserts that it seeks to avoid the setoffs to the extent Heesung improved its setoff position between October 7, 2015 -- the ninety (90) days prior to the bankruptcy petition date -- and the dates of the setoffs pursuant to 11 U.S.C. § 553(b).  In addition, the Trustee seeks to recover the value of the avoidable setoffs from Heesung pursuant to 11 U.S.C. § 550(a).  Heesung, however, argues that the Section 553 claim is due to be dismissed because the allegations in the Amended Complaint are factually inaccurate.

### 2.  Count II: Preference Claims pursuant to 11 U.S.C. §§ 547 & 550

The Trustee asserts avoidable preferences pursuant to 11 U.S.C. §§ 547 & 550. (16cv703, Doc. 24 at ¶¶ 119-132). The Trustee also seeks relief pursuant to 11 U.S.C. § 547(b)(4)(B), which allows for the avoidance of certain payments made "between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider." The Trustee explicitly alleges throughout the Amended Complaint that the alleged preferential payments were made while SpecAlloy was insolvent. The question of whether SpecAlloy was insolvent at the time of the transfers is "a factual issue to be decided at trial or some other juncture." *In re Alpha Protective Servs., Inc.*, 531 B.R. at 902.

### 3.  Claims III & IV: Fraudulent Conveyance Claims

8

The Trustee seeks to avoid $146,474,169.49 in transfers of the unpaid materials, seized pooled metals, and other transfers of goods and cash during the two-year period as fraudulent pursuant to 11 U.S.C. § 548(a)(1). (16cv703, Doc. 24 at ¶¶ 133-146). In addition, the Trustee seeks to avoid $199,364,363.32 in transfers of the unpaid materials, seized pooled metals, and all other goods and cash transferred during the four-year period as fraudulent pursuant to Alabama Code § 8-9A-4 and 8-9A-5 and 11 U.S.C. § 544. (16cv703, Doc. 24 at ¶¶ 147-162).

### 4.   Claims V & VI:  Recharacterization & Equitable Subordination

The Trustee asserts that this court should recharacterize Heesung's claim of advances as equity investments in SpecAlloy, rather than as loans. (16cv703, Doc. 24 at ¶¶ 163-177). Alternatively, the Trustee asserts that equitable subordination is warranted pursuant to 11 U.S.C. § 510(c). (16cv703, Doc. 24 at ¶¶ 178-189).

### 5.   Count VII – Conversion

The Suppliers assert that Heesung wrongfully took possession of the Supplier Converters and/or any materials taken therefrom, that LKQ, Brokers, or Enterprise held title to the Supplier Converters and any materials taken, and that LKQ, Brokers, and Enterprise are entitled to recover from Heesung the fair value of the Supplier Converters at the time of their conversion, plus interest. (16cv703, Doc. 24 at ¶¶ 190-207).

### 6.  Count VIII – Breach of Contract

9

The Suppliers assert that Heesung agreed to purchase Converters and/or Materials from LKQ, Brokers, and Enterprise pursuant to the Supplier Converter Contracts, but that Heesung has failed to pay for the Supplier Converters and therefore has breached the Supplier Converter Contracts. (16cv730, Doc. 24 at ¶¶ 208-220).

### 7.  Count IX – Quantum Meruit

The Suppliers further assert that to the extent that LKQ, Brokers, and Enterprise did not have contracts with Heesung that may be implied in fact, they had contracts that may be implied in law. (16cv703, Doc. 24 at ¶¶ 221-227).

### 8.  Count X – Unjust Enrichment

`      The Suppliers assert that Heesung was unjustly enriched by knowingly receiving, accepting, and retaining the Supplier Converters and any materials taken therefrom. (16cv703, Doc. 24 at ¶¶ 227-237).

### 9.  Count XI – Principal Liability

The Suppliers assert that SpecAlloy had actual authority to acquire Converters for Heesung's benefit, was subject to Heesung's control, and acted as Heesung's agent when it acquired Converters from LKQ, Brokers, and Enterprise on behalf of Heesung. Accordingly, the Suppliers assert, Heesung is liable to LKQ, Brokers, and Enterprise for the amounts owed to them by SpecAlloy for the Supplier Converters. (16cv703, Doc. 24 at ¶¶ 237-243).

### 10. Count XII – Partner/Joint Venture Liability

The Suppliers assert that Heesung and SpecAlloy went into business together for profit, thus forming a partnership or joint venture, and SpecAlloy acted as Heesung's agent in acquiring the Supplier Converters from LKQ, Brokers, and Enterprise for the purpose of profiting from their partnership or joint venture. Accordingly, the Plaintiffs aver that Heesung is liable to LKQ, Brokers, and Enterprise for the amounts owed for the Supplier Converters. (16cv703, Doc. 24 at ¶¶ 243-252).

### B. Heesung's Counterclaim

Heesung stated a single counter claim for a declaratory judgment "confirming who has an interest in the Supplier Converters," "confirming who was entitled to receive payment on account of Debtor's sale of Supplier Converters to Heesung," "declar[ing] that LKQ, Brokers, and Enterprise did not retain or otherwise preserve a bailment relationship with Debtor," and "establishing the relationship between and among Heesung, Debtor, LKQ, Brokers, and Enterprise." (1:16cv703-DAB; Doc. 49 at ¶¶ 92-95). The other parties have moved to dismiss the counterclaim, essentially as surplusage, arguing that Heesung's rights, if any, will be adjudicated and declared as the other claims are resolved. (16cv703, Docs. 59 and 60).

## IV. DISCUSSION

The Eleventh Circuit has held:

11

A district court may, for cause, withdraw the reference of a case or proceeding in bankruptcy under 28 U.S.C. § 157(d) which provides:

> "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, *for cause shown.* The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organization or activities affecting interstate commerce."

28 U.S.C. § 157(d) (1994) (emphasis added). The law of this circuit states that: "Once a bankruptcy court has assumed jurisdiction ... a district court may withdraw reference only 'for cause shown.' " *In re Parklane/Atlanta Joint Venture,* 927 F.2d 532, 536 (11th Cir.1991). Although cause is not defined in the statute, this court has found that it is not an empty requirement. *See id.* (requiring cause must be shown for the district court to withdraw the reference under 28 U.S.C. § 157(d)).

> As this court noted in *Parklane*:
>
> "Although this Court has not yet articulated criteria for determining the existence of cause for withdrawal, other courts have. In *Holland America Ins. Co. v. Succession of Roy,* 777 F.2d 992 (5th Cir.1985), the Fifth Circuit noted in dicta that in determining whether cause existed a district court should consider such goals as advancing uniformity in bankruptcy administration, decreasing forum shopping and confusion, promoting the economical use of the parties' resources, and facilitating the bankruptcy process. *Id.* at 998."

*Parklane,* 927 F.2d at 536 n. 5 (citations omitted).

*In re Simmons*, 200 F.3d 738, 741–42 (11th Cir. 2000).

The underlying actions involve related claims and counterclaims, some of which are considered core and others non-core proceedings under 28 U.S.C. § 157(b)(2):

(2) Core proceedings include, but are not limited to—

(A) matters concerning the administration of the estate;

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

(C) counterclaims by the estate against persons filing claims against the estate;

(D) orders in respect to obtaining credit;

(E) orders to turn over property of the estate;

(F) proceedings to determine, avoid, or recover preferences;

(G) motions to terminate, annul, or modify the automatic stay;

(H) proceedings to determine, avoid, or recover fraudulent conveyances;

(I) determinations as to the dischargeability of particular debts;

(J) objections to discharges;

(K) determinations of the validity, extent, or priority of liens;

(L) confirmations of plans;

13

(M) orders approving the use or lease of property, including the use of cash collateral;

(N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate;

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; and

(P) recognition of foreign proceedings and other matters under chapter 15 of title 11.

28 U.S.C. § 157. The Eleventh Circuit has held that:

The most helpful explanation of what is a core proceeding, accepted almost universally by the courts, is found in the Fifth Circuit's decision in *Wood v. Wood* (*In re Wood* ), 825 F.2d 90 (5th Cir.1987):

"If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding; for example, an action by the trustee to avoid a preference. If the proceeding is one that would arise only in bankruptcy, it is also a core proceeding; for example, the filing of a proof of claim or an objection to the discharge of a particular debt. If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding; it may be *related* to the bankruptcy because of its potential effect, but under section 157(c)(1) it is an 'otherwise related' or non-core proceeding."

*Id.* at 97 (emphasis in original), *cited in Gower v. FHA* (*In re Davis* ), 899 F.2d 1136, 1140-41 (11th Cir.), *cert. denied,* 498 U.S. 981, 111 S.Ct. 510, 112 L.Ed.2d 522 (1990).

*In re Toledo*, 170 F.3d 1340, 1348 (11th Cir. 1999).

14

Heesung advances four arguments in support of its motion.

**Efficiency Considerations--**Heesung first argues that "the District Court Litigation will face constant inefficiencies as the Trustee will continue to point to the proof of claim proceedings pending in the Bankruptcy Court." (Doc. 1 at 6). Heesung specifically points that out that the Trustee has stated:

> Given the opportunity, counsel for the Trustee would have explained that the Trustee's objections are subsumed within this litigation to the extent that they were based on Section 502(d), equity recharacterization, and equitable subordination. As explained above, under Section 502(d), Heesung's claim would be disallowed until Heesung paid any judgment the Trustee obtains on its avoidance actions in this litigation.

(16cv703, Doc. 60 at 15). Heesung further argues that "the District Court has presided over [16cv730] for nearly a year and a half now," and that "[i]t makes little sense from an efficiency standpoint to keep the proof of claim proceedings in the Bankruptcy Court." (Doc. 1 at 7-8).

The Trustee argues in response that "The Motion to Withdraw is premature because Heesung's claims against the Estate cannot be heard until after the District Court Litigation has concluded and Heesung has repaid all amounts owed to the Estate." (Doc. 4 at 5). Specifically, the Trustee argues that "Heesung cannot recover on its claims against the Estate until after the Trustee's Avoidance Claims against Heesung are adjudicated and Heesung has repaid the Estate any amounts for which it is liable. Only then will it be appropriate to reconvene the POC Proceedings." *Id.*

15

at 6. However, the Trustee's argument addresses the order in which the claims must be resolved, not whether the claims should be resolved in the District Court or the Bankruptcy Court. Moreover, it is clear that much of the discovery for both the Trustee's affirmative claims and the POC litigation will be in common.

**State Law Claims**--Heesung next argues that "Amended Complaint is predominated by noncore, state law claims asserted by the Supplier-Plaintiffs against Heesung, including state law claims of conversion; breach of contract; quantum meruit; unjust enrichment; principal liability; and partner/joint venture liability." (Doc. 1 at 9). The Trustee does not dispute the non-core nature of the state law claims in 16cv703 or that Counts I – VI are core claims. Rather, the Trustee argues that the claims in 16cv703 "have nothing to do with the POC Proceedings, and Heesung has failed to show otherwise." (Doc. 4 at 11). Such a position is inconsistent with the averments in Count I of the Trustee's Amended Complaint which specifically references Heesung's proof of claim, the Trustee's objection thereto, and how those matters affect the claim for Avoidable Setoff. (16cv703, Doc. 24 at ¶¶ 93-98). If anything, 16cv703 demonstrates the complex, unavoidably intertwined nature of the core, non-core, Bankruptcy Court, and District Court litigation.

**Legal v. Equitable Claims**--Heesung argues that the "claims set forth in the Amended Complaint are mostly legal in nature and seek payment of monetary damages as remedies," and that "the fact that the claims are legal, not equitable,

16

supports withdrawal of the reference." (Doc. 1 at 9-10). The Trustee responds that "the fact that the Supplier Plaintiffs have made a jury demand does not constitute cause to withdraw the reference in the POC Proceedings, which are unrelated to the Supplier Plaintiffs' claims." (Doc. 4 at 12). Neither party makes a compelling argument as to whether the legal versus equitable nature of the various claims militates for or against withdrawal of the reference. The Amended Complaint alleges jury and non-jury matters regardless whether the reference is withdrawn.

**Choice of Forum--**Heesung briefly argues that the Court "should withdraw the reference to prevent the Trustee's overt, unabashed judge shopping." (Doc. 1 at 11). The Trustee argues similarly that "Heesung's belated effort to get the POC Proceedings moved to the District Court is a transparent exercise in forum shopping." (Doc. 4 at 13). Neither party supports their allegation of forum shopping with relevant authority or sufficient facts to render this argument of any weight to this motion.[4]

---

[4] Somewhat ruefully, the Court notes that forum shopping, to the extent it may seek a particular presiding judge, is a forlorn effort here. Due to demographics and the judicial emergency facing the Middle District of Alabama, no one can know what judges may assigned to hear the issues in these cases. The assigned Bankruptcy Judge has retired. The Magistrate Judge originally presiding by consent in 16cv703 in no longer assigned to the case in anticipation of his confirmation to a judgeship in another district. And, as the local legal community is all too aware, visiting district judges by the score have routinely been accepting assignments in cases here. At some point, the vacant judgeships will be filled, and the district judge assignment could change. Given this volatility and uncertainty, forum shopping would be an empty exercise.

From the description of the competing claims and the nature of the overall bankruptcy case, it is clear that determination of the legal implications of Heesung's conduct vis-à-vis the Debtor predominates over all other matters in the bankruptcy case, and orderly resolution of those issues is needed to allow the Estate to be administered and liquidated. Ultimately, the exercise of sound discretion counsels providing the parties a unified forum for efficient and consistent resolution of all necessary issues. **To that end, the undersigned recommends withdrawal of the reference and the creation of a new docket for the proof-of-claim proceeding. It is further recommended that this matter be considered and coordinated with the proceedings in 16cv703.**

This approach would allow implementation of a unified plan for discovery and staging of decision points (by motion, hearing or trial as may be appropriate) as the facts and legal positions dictate. This would preserve for all parties the ability to present their cases in an orderly fashion and allow the Court to determine what matters should be decided in what order, based on a full record. This should also facilitate proper application of principles of estoppel and preclusion for an efficient and consistent result.

If this Recommendation is adopted, the parties should be provided with a new opportunity to consent to the Magistrate Judge presiding in both matters, given the changes in judicial assignments and the presence of new matters and procedural

posture. If there is consent, the Magistrate Judge can convene both cases to confer with counsel as to coordination and scheduling of new pleadings (if needed), discovery and adjudications as may be appropriate. If there is not consent as to the new issues, it is recommended that the reference in 16cv703 to the Magistrate Judge be withdrawn with the proviso that both 16cv703 and the new case be assigned to the same pairing of district and magistrate judges. The cases could then be handled as described above, except with the district judge being responsible for dispositive matters.

## V.    CONCLUSION AND RECOMMENDATION

Accordingly, for the reasons as stated, it is the **RECOMMENDATION** of the Magistrate Judge that Heesung's motion to withdraw the reference (Doc. 1) is due to be **GRANTED.**

It is **ORDERED** that the parties shall file any objections to this Recommendation on or before **April 24, 2018.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo*

determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).

 DONE and ORDERED this 9th day of April 2018.

<br>

     David A. Baker
     United States Magistrate Judge